Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL VIII**

| | | |
|---|---|---|
| J.J. Annoni, Inc.<br><br>Apelante<br><br>vs.<br><br>Caribbean Display and Construction, Inc.<br><br>United Surety and Indemnity Company; Demandados Desconocidos 1-5<br><br>Apelados | KLAN202400708 | **APELANTES**<br>procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.:<br>K AC2017-0099<br><br>Sobre:<br>Incumplimiento de Contrato; Cobro de Dinero |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón.

Rivera Colón, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de noviembre de 2024.

Comparece ante nos, J.J. Annoni, Inc. (Annoni o apelante), quien presenta recurso de apelación en el que solicita la revocación de la "Sentencia" emitida el 27 de junio de 2024,[1] por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante dicho dictamen, el foro primario declaró No Ha Lugar la reclamación presentada por el apelante, y Ha Lugar la reconvención presentada por Caribbean Display and Construction, Inc. (CDC o apelada).

Examinada la solicitud de autos, la totalidad del expediente y el estado de derecho aplicable ante nuestra consideración, confirmamos el dictamen mediante los fundamentos que expondremos a continuación.

**I.**

El 31 de enero de 2017, Annoni presentó una "Demanda" por incumplimiento de contrato y cobro de dinero contra CDC, United

---

[1] Notificada el 28 de junio de 2024.

Surety and Indemnity Company (USIC), y Plaza del Caribe, SE (PCSE). En resumidas cuentas, alegó que PCSE contrató a CDC para un proyecto de remodelación en Plaza del Caribe y que, el 16 de enero de 2015, CDC subcontrató a Annoni para realizar unos trabajos de remoción e instalación de losas en el antedicho centro comercial. Afirmó que, tras una mensura del piso, resultó que la cantidad de losa instalada fue mayor a la contratada por CDC, por lo que esta última facturó y cobró $129,294.58 por dicho exceso. Sin embargo, arguyó que, a pesar de haber culminado las labores para la cuales se le contrató, CDC se negó a pagarle esta cuantía. Adujo que PCSE es responsable por pago de lo indebido, y que USIC, al fungir como garantizador del pago de las deudas de CDC, también responde por la cuantía reclamada. Reclamó el pago de los $129,294.58, más intereses, costas, gastos y honorarios de abogado.

El 3 de abril de 2017, CDC y USIC, en conjunto, presentaron su "Contestación a la Demanda" y negaron varias de las alegaciones contenidas en la reclamación.

Ese mismo día, o sea, el 3 de abril de 2017, CDC presentó una "Reconvención y Demanda contra Coparte" contra Annoni y PSCE. Aseveró que, PSCE tomó la decisión de descontar la suma de $78,656.98 de las facturas de CDC, debido a los daños provocados a terceros y el alto desperdicio de material por parte de Annoni. Sostuvo que, por este motivo, CDC descontó a Annoni, en concepto de *back charge*, la suma de $39,328.49 en las facturas pendientes de pago. Adicionalmente, descontó otras partidas adicionales denominadas "contracargos" las cuales, sumadas al *back charge*, ascienden a la cantidad total de $44,028.49. Expuso que, tras restar el *back charge* y los contracargos, el 17 de marzo de 2016, remitió a Annoni un cheque por $15,582.92 en saldo total de la deuda. Sin embargo, indicó que Annoni se negó a recibir el

pago y procedió a reclamarle una cantidad mayor a PSCE y a USIC, lo que tuvo el efecto de que PSCE le retuviera a CDC la suma de $43,500.00. Asimismo, esbozó que se le perjudicó la relación de crédito con el Banco Santander, quien le cobró intereses y recargos por la dilación en el desembolso del pago final. Como remedio, solicitó $50,000.00 por los daños ocasionados por Annoni, y que se le ordenase a PSCE a pagar los $43,500.00 que retuvo.

Tras varias incidencias procesales, Annoni y CDC acordaron desistir de sus respectivos reclamos contra PSCE.[2] En atención a lo cual, el 20 de mayo de 2021,[3] el Tribunal de Primera Instancia emitió una "Sentencia Parcial" y decretó el archivo, con perjuicio, de la causa de acción presentada en su contra.

Por este motivo, el 25 de mayo de 2021, Annoni presentó una "Segunda Demanda Enmendada", y reiteró sus alegaciones en cuanto a CDC y USIC. Estos presentaron su "Contestación a la Segunda Demanda Enmendada" el 4 de junio de 2021.

El juicio en su fondo comenzó el 19 de marzo de 2024, y comparecieron todas las partes. Luego de evaluada la prueba documental y testifical, el 27 de junio de 2024,[4] el Tribunal de Primera Instancia emitió "Sentencia" en la cual adoptó las siguientes determinaciones de hecho, las cuales hacemos formar parte íntegra del presente dictamen:

> *1. En noviembre de 2014, PLAZA contrató a la parte demandada-reconviniente, CDC, como contratista general para un proyecto de remodelación en su propiedad conocida como Plaza del Caribe Mall, en Ponce, Puerto Rico. A tenor con el contrato, los trabajos debían terminarse y entregarse no más tarde del 15 de noviembre de 2015.*
>
> *2. Como parte de los acuerdos entre CDC y PLAZA, y a solicitud de CDC, el 11 de diciembre de 2014, la parte codemandada, United Surety and Indemnity Company (en adelante, "USIC"), emitió la fianza de cumplimiento*

---

[2] Véase, "Estipulación de Desistimiento Parcial", apéndice pág. 16.
[3] Notificada el 26 de mayo de 2021.
[4] Notificada el 28 de junio de 2024.

*y pago número 14170148 ("Payment and Performance Bond"), garantizando solidariamente el pago de materiales y mano de obra incorporados en el proyecto de remodelación de Plaza del Caribe Mall en Ponce, Puerto Rico, sujeto a los términos y condiciones de la referida fianza.*

*3. Como parte de los acuerdos entre CDC y PLAZA, se acordó que los pagos por las certificaciones sometidas por CDC se emitieran a la orden de CDC y el Banco de Santander de Puerto Rico, para repagar una facilidad de crédito que dicha entidad bancaria concedió a CDC.*

*4. Subsiguientemente, el 19 de enero de 2015, CDC contrató los servicios de la parte demandante-reconvenida, ANNONI mediante Orden de Compra (también conocido como "PO" o "Purchase Order") número 213343, que emitió CDC para la demolición e instalación de losas de cerámica en el proyecto de remodelación antes referido por la cantidad de $850,877.82.*

*5. ANNONI no figura como contratante en el Contrato de Obra entre PLAZA y CDC.*

*6. ANNONI ejecutó el trabajo contratado y presentó a CDC facturas/certificaciones de cobro.*

*7. El trabajo de demolición e instalación de losas de cerámica realizado por ANNONI y aceptado por CDC y PLAZA, luego de los cambios solicitados por este último, ascendió a la suma de $892,015.23.*

*8. CDC terminó y entregó los trabajos contratados con PLAZA a su satisfacción y dentro del término convenido. No obstante, en lo concerniente a los trabajos realizados por ANNONI, PLAZA tomó la decisión de descontar de las facturas de CDC una suma equivalente al 16% del total del costo de la cerámica suplida por PLAZA. Dicho descuento fue por el alto desperdicio de material por parte de ANNONI en la instalación de las losas. La cantidad descontada por PLAZA a CDC por este concepto fue la suma de $76,656.98.*

*9. CDC decidió compartir con ANNONI el descuento efectuado por PLAZA y le descontó de las facturas pendientes de pago a ANNONI el cincuenta por ciento (50%), o sea, la cantidad de $39,328.49 como contracargo o "back charge".*

*10. Adicionalmente, CDC descontó a ANNNONI las siguientes partidas: $2,400.00 por uso de "dumpsters"; $1,950.00 por daños a terceros (tiendas Claro, Pandora y Borroto); y $350.00 por el reemplazo de puerta dañada por "pallet jack" en la entrada del pasillo del almacén. En conjunto, estos descuentos junto al back charge antes indicado (en adelante, conjuntamente, los "contracargos") ascienden a la cantidad total de $44,028.49.*

*11. A la fecha del 11 de marzo de 2016, CDC había pagado a ANNONI la suma de $832,403.77.*

*12. El 10 de marzo de 2016, ANNONI presentó la reclamación número 169566 ante USIC, bajo la fianza de cumplimiento y pago número 14170148.*

*13. El 17 de marzo de 2016, en saldo total de los trabajos subcontratados, CDC remitió a ANNONI un cheque por $15,582.94, tras deducirle los contracargos, pero ANNONI se rehusó a recibir dicho pago.*

*14. La reclamación presentada por ANNONI ante USIC fue denegada el 25 de mayo de 2016, toda vez que CDC rechazó adeudar $78,606.73 a ANNONI.*

Tras un análisis del derecho aplicable, el foro *a quo* declaró No Ha Lugar la "Segunda Demanda Enmendada" presentada por Annoni, y Ha Lugar la reconvención presentada por CDC. Concluyó que, si bien Annoni culminó los servicios para los cuales fue contratado, la prueba vertida en juicio demostró que éste incurrió en desperdicio de material y, además, causó daños a terceros. Determinó que, ante estas circunstancias, el *back charge* efectuado por CDC a Annoni fue razonable, por lo que CDC solo le adeuda la suma de $15,582.94. Sin embargo, por entender que los reclamos presentados por Annoni ante PSCE y USIC le provocaron daños a CDC, estimó adecuado concederle una compensación por una suma igual a la adeudada ($15,582.94), relevando así a CDC de tener que pagar dicha cuantía a Annoni. Además, dictaminó que Annoni actuó temerariamente, y le impuso el pago de $5,000.00 en honorarios de abogado. Finalmente, razonó que, como CDC nunca se negó a pagar la deuda, USIC no es responsable por dicha cantidad.

Inconforme, Annoni recurre ante este foro apelativo mediante escrito de apelación presentado el 29 de julio de 2024, y señala la comisión de los siguientes errores, a saber:

*(A) Erró el Honorable Tribunal de Primera Instancia al declarar Ha Lugar la Reconvención planteada por el apelado con prueba insuficiente en derecho para sostener* [las] *alegaciones, solo a base de su testimonio oral, sin que presentara los documentos que apoyaran las cantidades solicitadas.*

*(B) Erró el Honorable Tribunal de Primera Instancia al determinar que el demandante fue temerario al presentar su demanda en reclamo justo de cobro de dinero que se le adeudaba, e imponer honorarios*

## II.

### -A-

Es principio cardinal de la revisión apelativa que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos deben abstenerse de intervenir en la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. *Peña Rivera v. Pacheco Caraballo*, 2024 TSPR 48, 213 DPR ___. Es decir, los tribunales apelativos deben mantener deferencia para con la apreciación de la prueba que realiza el Tribunal de Primera Instancia. *Pueblo v. Negrón Ramírez*, 2024 TSPR 41, 213 DPR ___.

Esta norma de deferencia judicial está predicada en el reconocimiento de que, de ordinario, los juzgadores de hechos se encuentran en mejor posición para evaluar, aquilatar y adjudicar la prueba testifical presentada ante sí. *Barreto Nieves et al. v. East Coast*, 2024 TSPR 40, 213 DPR ___. Este manto de deferencia "cobra mayor vigencia cuando se trata de la prueba testifical (oral) desfilada en el juicio", ya que, precisamente, es el juzgador quien tiene la oportunidad de oír, ver y apreciar el comportamiento del testigo. *Pueblo v. Negrón Ramírez, supra.* Después de todo, el foro apelativo solo tiene récords mudos e inexpresivos. *SLG Rivera-Pérez v. SLG Díaz-Doe et al.*, 207 DPR 636, 658 (2021), citando a *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009).

### -B-

La Regla 44.1 (d) de las de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1 (d), rige lo concerniente a la imposición de honorarios de abogado. Pertinente al caso que nos ocupa, la precitada regla lee como sigue:

> *(d) Honorarios de abogado – En caso de que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en*

*su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. En caso de que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o instrumentalidades haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté expresamente exento por ley del pago de honorarios de abogado.*

Según se desprende de la precitada disposición legal, la imposición o concesión de honorarios de abogado no procede en todos los casos. En nuestro ordenamiento, la concesión de honorarios de abogado depende de que el juzgador determine que una parte o su abogado actuó con temeridad o frivolidad. *PR Fast Ferries et al. v. AAPP*, 2023 TSPR 121, 213 DPR ___. A modo de excepción, esta norma cede cuando una ley especial lo establezca expresamente. *Íd.* En otras palabras, una determinación previa de temeridad no es necesaria cuando el estatuto especial requiere que el juzgador imponga una suma razonable por honorarios de abogado. *Ortiz Valle v. Panadería Ricomini*, 210 DPR 831, 838-839 (2022).

Se entiende que una de las partes o su representante legal actúa temerariamente al dilatar los procesos ya instados, crear gestiones evitables, o interponer pleitos frívolos que obliguen a la otra parte a incurrir en gastos innecesarios. *Pérez Rodríguez v. López Rodríguez et al.*, 210 DPR 163, 193 (2022). Su propósito es penalizar al "[l]itigante perdidoso que, por su obstinación, terquedad, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, los gastos, el trabajo y los inconvenientes de un pleito". *Íd., citando a P.R. Oil v. Dayco*, 164 DPR 486, 511-512 (2005).

La determinación de temeridad o frivolidad descansa en la discreción del tribunal. *SLG González-Figueroa v. SLG et al.*, 209

DPR 138, 150 (2022). Por ende, los tribunales apelativos solo intervendrán con dicha determinación cuando surja un abuso de discreción. *Íd.* Ahora bien, determinada la existencia de temeridad, la imposición de honorarios de abogado es mandatoria. *Pérez Rodríguez v. López Rodríguez et al.*, *supra*, a las págs. 192-193.

No obstante lo anterior, no procede la imposición del pago de honorarios de abogado en las siguientes circunstancias: (1) cuando se plantean asuntos complejos y novedosos; (2) cuando se actúa acorde con una apreciación errónea del derecho y no existen precedentes vinculantes sobre el asunto, o (3) cuando exista una discrepancia genuina en cuanto al derecho aplicable a los hechos del caso. *SLG González-Figueroa v. SLG et al.*, *supra*, a la pág. 149. En estas situaciones, la temeridad es inexistente. *VS PR, LLC v. Drift-Wind,* 207 DPR 253, 277 (2021).

### III.

El 19 de marzo de 2024, el Tribunal de Primera Instancia celebró juicio en su fondo en el cual evaluó el testimonio de los testigos presentados por ambas partes. Toda vez que el primer señalamiento de error versa sobre la apreciación de la prueba, procedemos a hacer un breve relato de sus declaraciones.

El primer testigo fue **Juan Nicolás Annoni Mesías**, quien declaró ser el presidente de Annoni,[5] y que dicha corporación fue subcontratada en el año 2015 para realizar un trabajo de remoción e instalación de losas en el centro comercial de Plaza del Caribe.[6] Testificó que, para realizar el proyecto, se le contrató mediante un *purchase order* ("PO"),[7] por la cuantía total de $850,862.82.[8] Indicó que dicha suma de dinero no le fue satisfecha en su totalidad,[9] ya que aún se le adeuda la diferencia de $59,611.46.[10]

---

[5] Véase, TPO a la pág. 25, líneas 6-11; pág. 26, líneas 9-11.
[6] Véase, TPO a la pág. 25, líneas 18-22.
[7] Véase, TPO a la pág. 25, líneas 23-24; pág. 26, líneas 1-8.
[8] Véase, TPO a la pág. 27, líneas 18 y 19.
[9] Véase, TPO a la pág. 27, líneas 19-22.

Explicó que esta cantidad corresponde a un pietaje adicional en la losa que se instaló, según la mensura que llevó a cabo un agrimensor de Plaza.[11] Mencionó que, salvo el *warning* en cuanto a la tienda de Claro, no recibió reclamo adicional por parte de CDC con respecto a trabajo mal realizado o desperdicio de losa.[12]

En el contrainterrogatorio, reafirmó que los $59,611.46 que reclama corresponden a una mensura de la cual surgió un pietaje mayor,[13] y que CDC se comprometió a pagar dicha cuantía.[14] Se le preguntó si para el mes de marzo del año 2016 recibió una notificación de parte del apelado en la que se explicaban los contracargos, y contestó en la negativa.[15] No obstante lo anterior, al confrontársele con copia de la aludida notificación, reconoció que la misma fue dirigida a su correo electrónico corporativo Jjannoni@yahoo.com,[16] y que informaba sobre un desperdicio de 16.4%.[17] Por otro lado, negó haber recibido algún *warning* con relación a la tienda Borroto, al uso excesivo de zafacones, o el reemplazo de puerta dañada por *pallet jack*.[18] Sin embargo, a pesar de haber dicho que no tuvo ningún tipo de *warning* con relación a los trabajos,[19] luego admitió que, en efecto, recibió *warnings* los días 4 de agosto de 2015,[20] 1 de abril de 2015,[21] y 22 de mayo de 2015.[22] Por su parte, manifestó que no recibió notificación alguna sobre el uso excesivo de losas,[23] y que tampoco hubo desperdicio en el proyecto.[24] Aclaró que no se considera

---

[10] Véase, TPO a la pág. 30, líneas 15-19; pág. 41, líneas 10-14.
[11] Véase, TPO a la pág. 30, líneas 8-14.
[12] Véase, TPO a la pág. 32, líneas 7-24; pág. 33, líneas 1-12.
[13] Véase, TPO a la pág. 42, líneas 7-9.
[14] Véase, TPO a la pág. 42, líneas 10-12.
[15] Véase, TPO a la pág. 43, líneas 11-21.
[16] Véase, TPO a la pág. 61, líneas 7-19; pág. 64, líneas 17-21.
[17] Véase, TPO a la pág. 64, líneas 8-16.
[18] Véase, TPO a la pág. 49, líneas 2-18.
[19] Véase, TPO a la pág. 72, líneas 17-21.
[20] Véase, TPO a la pág. 73, líneas 14-24; pág. 74, líneas 1-10.
[21] Véase, TPO a la pág. 75, líneas 3-20.
[22] Véase, TPO a la pág. 76, líneas 5-22.
[23] Véase, TPO a la pág. 53, líneas 14-22.
[24] Véase, TPO a la pág. 53, líneas 23 y 24; pág. 54, líneas 1 y 2.

desperdicio aquél que se contempla en la instalación,[25] el cual usualmente es un 10%,[26] pero en este caso era más.[27] Aunque reconoció que el proyecto es uno complejo por tener zonas curvas,[28] expresó que la instalación quedó perfecta y no hubo nada que remover o corregir.[29] Esto, a pesar de aceptar que, cuando se le contrató, él mismo advirtió que la cantidad de desperdicio en la zona curva sería mayor.[30] Sostuvo que, aunque hubo una reinstalación de 600 pies, se utilizó el mismo material y no se rompió ninguna losa.[31]

En el re-directo, se le preguntó si tenía conocimiento de que se hubiera acordado un desperdicio de 16.4% entre las partes, y dijo que no.[32] En cuanto al *warning* del 4 de agosto de 2015, relató que, aunque inicialmente se le culpó por el problema, se trataba de un trabajo de demolición que no fue realizado por Annoni, sino por CDC.[33] Sobre el *warning* del 1 de abril de 2015, expuso que las deficiencias fueron corregidas.[34] Finalmente, respecto al *warning* del 22 de mayo de 2015, esbozó que envió su póliza para proceder con el seguro.[35]

En el re-contrainterrogatorio, insistió en que no se le hizo ningún *warning*.[36]

El segundo testigo fue el señor **Rafael Pagán González**, quien declaró ser el presidente de CDC.[37] Con relación a la certificación final, testificó que PSCE le emitió un comunicado, el cual se le copió al señor Annoni, donde se estimó un 16.4% de desperdicio, lo que representa un porcentaje mayor al

---

[25] Véase, TPO a la pág. 54, líneas 9-20.
[26] Véase, TPO a la pág. 54, líneas 21-23.
[27] Véase, TPO a la pág. 55, líneas 1 y 2.
[28] Véase, TPO a la pág. 55, líneas 6-17.
[29] Véase, TPO a la pág. 56, líneas 5 y 13.
[30] Véase, TPO a la pág. 56, líneas 18 y 24.
[31] Véase, TPO a la pág. 58, líneas 2-18.
[32] Véase, TPO a la pág. 79, líneas 9-12.
[33] Véase, TPO a la pág. 80, líneas 16-24; pág. 81, líneas 1-4.
[34] Véase, TPO a la pág. 81, líneas 9-16.
[35] Véase, TPO a la pág. 81, líneas 20-24; pág. 82, líneas 1-7.
[36] Véase, TPO a la pág. 83, líneas 2-23.
[37] Véase, TPO a la pág. 87, líneas 12-24.

acostumbrado.[38]   Explicó que el monto final de la liquidación fue por la cantidad de $15,582.94,[39] y que dicha cuantía es el resultado tras restarle los *back charges* al balance de pago de $59,611.46.  Añadió que, a pesar de que el responsable del 16.4% de desperdicio fue la compañía subcontratada, en este caso Annoni, lo cierto es que CDC estipuló asumir el 50% de la responsabilidad.[40]   Indicó que, aunque CDC estaba dispuesto a pagar el dinero, Annoni se negó a recibir los $15,582.94.[41] Mencionó que la reacción de Annoni fue demandarlos y reclamarle a USIC, quien denegó la reclamación.[42]   Aseveró que, a pesar de que Annoni prometió un 5% de desperdicio, el inspector de Plaza determinó que fue un 16% y CDC no puede refutar esa decisión.[43] Por último, dijo que esta situación le provocó a CDC los siguientes inconvenientes: (1) Plaza le aguantó el retenido que le debía;[44] (2) la empresa tuvo que desembolsar de su *cash flow* para pagarle al banco,[45] lo que le costó un estimado de entre quince a diecisiete mil dólares en intereses;[46] y (3) un gasto de más de $50,000.00 dólares en honorarios de abogado.[47]

El último testigo fue el señor **Víctor Braegger Semanaz**, vicepresidente de CDC,[48] quien declaró sobre los contracargos.  Al respecto, esgrimió que Annoni utilizó los zafacones de CDC para el desecho de los trabajos realizados, por lo que se le aplicó un *back charge* de $2,400.00 por el uso de *dumpsters*.[49]  Comentó que, una vez se terminaban las operaciones, todos los días iba a revisar qué

---

[38] Véase, TPO a la pág. 89, líneas 5-16.
[39] Véase, TPO a la pág. 91, líneas 17-24; pág. 91, línea 1.
[40] Véase, TPO a la pág. 92, líneas 2-13.
[41] Véase, TPO a la pág. 92, líneas 13-19.
[42] Véase, TPO a la pág. 98, líneas 19-24; pág. 99, líneas 1-8.
[43] Véase, TPO a la pág. 100, líneas 1-11.
[44] Véase, TPO a la pág. 100, líneas 22-24; pág. 101, línea 1; pág. 102, líneas 5-10.
[45] Véase, TPO a la pág. 100, líneas 1-11.
[46] Véase, TPO a la pág. 103, líneas 17-24; pág. 104, líneas 1-19.
[47] Véase, TPO a la pág. 104, líneas 23-24; pág. 105, líneas 1-7.
[48] Véase, TPO a la pág. 120, líneas 17-21.
[49] Véase, TPO a la pág. 128, líneas 3-13.

era lo que se había desperdiciado.[50] Alegó que esto quedó demostrado mediante evidencia fotográfica que se le entregaba a la gerencia del centro comercial.[51] Por otro lado, expresó que CDC aplicó un *back charge* de $1,950.00 por daños ocasionados a las tiendas Claro, Pandora y Borroto.[52] Sostuvo que, los daños consistieron en rotura de cerámica que fue reemplazada por la apelada.[53] Además, relató que, los empleados de Annoni dañaron una puerta que también fue reemplazada por CDC, por lo que se aplicó otro *back charge* de $350.00.[54] Adicionalmente, indicó que, se aplicó un *back charge* de $39,328.49 por losa instalada incorrectamente.[55] Explicó que se llegó a esa cantidad porque diariamente se tomaban fotografías del trabajo mal hecho, y que la losa se rompía al removerse.[56] Acentuó que el total de contracargos sumaban la cantidad de $44,028.49,[57] por lo que el balance pendiente de pago se redujo a $15,582.94.[58] Finalmente, expuso que notificó los *back charges* al final del proyecto,[59] ya que no es hasta el final del proyecto que se pueden cuantificar en su totalidad los desperdicios.[60]

En el contrainterrogatorio, esbozó que contabilizaba las losas del almacén haciendo un inventario físico,[61] el cual se preparaba semanal o mensualmente.[62] A su vez, afirmó poseer recibo del *back charge* de $2,400.00,[63] del de $1,950.00,[64] del de $350.00,[65] y

---

[50] Véase, TPO a la pág. 127, líneas 15-24; pág. 128, líneas 1 y 2.
[51] *Íd.*
[52] Véase, TPO a la pág. 128, líneas 14-24; pág. 129, líneas 1 y 3.
[53] *Íd.*
[54] Véase, TPO a la pág. 129, líneas 4-19.
[55] Véase, TPO a la pág. 130, líneas 13-18.
[56] Véase, TPO a la pág. 129, líneas 20-24; pág. 130, líneas 1-12.
[57] Véase, TPO a la pág. 130, líneas 19-22.
[58] Véase, TPO a la pág. 131, líneas 3-5.
[59] Véase, TPO a la pág. 132, líneas 16-21.
[60] Véase, TPO a la pág. 123, líneas 18-24; pág. 124, líneas 1 y 2.
[61] Véase, TPO a la pág. 134, líneas 14-23.
[62] Véase, TPO a la pág. 134, línea 24; pág. 135, líneas 1-4.
[63] Véase, TPO a la pág. 136, líneas 1-12.
[64] Véase, TPO a la pág. 137, líneas 1-13.
[65] Véase, TPO a la pág. 137, líneas 14-22.

del de $39,328.49.[66]  No obstante, reconoció que no los presentó en el juicio.[67]

Luego de escuchar los testimonios que anteceden, el foro primario emitió una "Sentencia" en la que formuló las siguientes determinaciones de hecho:

[...]

*8. CDC terminó y entregó los trabajos contratados con PLAZA a su satisfacción y dentro del término convenido. No obstante, en lo concerniente a los trabajos realizados por ANNONI, PLAZA tomó la decisión de descontar de las facturas de CDC una suma equivalente al **16**% del total del costo de la cerámica suplida por PLAZA. **Dicho descuento fue por el alto desperdicio de material por parte de ANNONI** en la instalación de las losas. La cantidad descontada por PLAZA a CDC por este concepto fue la suma de $**76,656.98**.*

*9. CDC decidió compartir con ANNONI el descuento efectuado por PLAZA y le descontó de las facturas pendientes de pago a ANNONI el cincuenta por ciento (**50**%), o sea, la cantidad de $**39,328.49** como contracargo o "back charge".*

*10. Adicionalmente, CDC descontó a ANNNONI las siguientes partidas: $**2,400.00** por uso de "dumpsters"; $**1,950.00** por daños a terceros (tiendas Claro, Pandora y Borroto); y $**350.00** por el reemplazo de puerta dañada por "pallet jack" en la entrada del pasillo del almacén. En conjunto, estos descuentos junto al back charge antes indicado (en adelante, conjuntamente, los "contracargos") ascienden a la cantidad total de $**44,028.49**.*

[...]  (Énfasis nuestro).

A tenor, el foro apelado concluyó que, como Annoni incurrió en desperdicio de material y causó daños a terceros, los contracargos efectuados por CDC fueron razonables.  Por su parte, el foro *a quo* dictaminó que Annoni fue temerario al dilatar los procesos, y le impuso el pago de $5,000.00 en concepto de honorarios de abogado.

En su escrito, Annoni alega, como primer error, que el Tribunal abusó de su discreción al determinar que procedían estos contracargos, únicamente a base del testimonio oral vertido en sala, y sin que se presentase prueba documental para corroborar

---

[66] Véase, TPO a la pág. 137, líneas 23 y 24; pág. 138, líneas 1-3.
[67] Véase, TPO a las págs. 136-138.

el mismo.    En otras palabras, su contención es que el foro de instancia se conformó con el testimonio oral presentado por CDC, y no exigió evidencia material para corroborar que las cantidades solicitadas eran correctas.    En apoyo a su postura, hace alusión a que los testigos del apelado declararon poseer prueba documental de récords y recibos en que apoyan sus descuentos más, sin embargo, no presentaron ninguno en evidencia.

En su oposición, CDC argumenta que los contracargos y los daños reclamados en su reconvención fueron sostenidos por la prueba, o sea, por el testimonio de los testigos presentados por CDC.    A tales efectos, enfatiza que la evidencia directa de un solo testigo es suficiente para probar cualquier hecho, según provee la Regla 110 (d) de Evidencia, 32 LPRA Ap. VI, R. 110 (d). Resolvemos que le asiste la razón, por los fundamentos que se exponen a continuación.

Según ya mencionamos, como norma general, este tribunal apelativo no intervendrá con las determinaciones de hechos y la apreciación de la prueba que haga el Tribunal de Primera Instancia, salvo que éste último haya incurrido en prejuicio, parcialidad, pasión o error manifiesto. Tras un examen de los testimonios que anteceden, concluimos que en la situación particular que atendemos no están presentes ningunas de las excepciones ya mencionadas y, por tanto, no debemos intervenir.

El apelante argumenta que el caso de marras es uno de insuficiencia de prueba, por lo que el comportamiento testifical no es suficiente para probar alegaciones. Aunque los conceptos de credibilidad y suficiencia no son equivalentes,[68] lo cierto es que, tal y como ocurre en el presente caso,

---

[68] La credibilidad consiste en el ejercicio valorativo que realiza el juzgador de los hechos sobre la totalidad de la prueba. Por su parte, la suficiencia es el análisis del contenido y la existencia de evidencia, no su valor probatorio. *Pueblo v. Colón, Castillo,* 140 DPR 564, 578-579 (1996).

> *[M]uchas veces el planteamiento sobre insuficiencia de la prueba es uno que se reduce a la credibilidad que se le da a los testigos y a la apreciación que hace el juzgador de instancia sobre la prueba desfilada ante sí. Conforme a ello, podemos decir que esto se debe a que el planteamiento de insuficiencia de prueba suele usarse para atacar, precisamente, la valorización que hace el juzgador de hechos de la prueba que se le presenta. A esos fines, hemos expresado que cuando los planteamientos sobre insuficiencia de prueba se reducen a uno de credibilidad de testigos (apreciación de la prueba), también seremos deferentes con los foros de instancia. Pueblo v. Negrón Ramírez, supra.* (Citas Omitidas).

**En el caso de autos**, **la presentación de documentos en apoyo a las cantidades solicitadas no es un elemento necesario en derecho**. **Es decir**, **CDC no tenía que presentar evidencia de recibos u otro particular para probar su caso**, **toda vez que la ley no exige la presentación de este tipo de evidencia como elemento para que prospere su causa de acción**. Aunque la prueba documental pudiese ser una prueba más firme y satisfactoria que el testimonio oral, ello no constituye un impedimento para que el Tribunal concediese un remedio a base de los testimonios vertidos en juicio. Recordemos que, salvo que otra cosa se disponga por ley, "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho". Regla 110 (d) de Evidencia, *supra*.

El foro primario catalogó el testimonio del presidente de Annoni como "contradictorio, inexacto e insuficiente".[69] De hecho, le tuvo que apercibir las advertencias sobre perjurio.[70] En cambio, el juzgador otorgó entera credibilidad al testimonio del presidente de CDC en cuanto a que: (1) CDC nunca se negó a pagar los $15,582.94; y (2) la conducta desplegada por Annoni perjudicó al apelado, causándole daños y gastos en honorarios legales. Por otro lado, razonó que la prueba desfilada – refiriéndose a la prueba documental y testifical que fue admitida en juicio – estableció

---

[69] Véase, "Sentencia" a la pág. 12.
[70] Véase, TPO a las págs. 69 y 70.

preponderantemente que el apelante incurrió en un desperdicio de material mayor a lo usual, y que ocasionó daños a terceros (tiendas Claro, Pandora y Borroto) en el desempeño de sus funciones. Aunque el Tribunal reconoció que CDC no fue preciso en las cuantías reclamadas, no es menos cierto que, dentro de su discreción y tras ponderar toda la evidencia, solo le otorgó una compensación de $15,582.94, aun cuando el presidente de CDC declaró haber sufrido una cantidad significativamente mayor en daños.

A nuestro juicio, esta determinación representa el balance más razonable, justiciero y jurídico de toda la evidencia recibida. Ante este cuadro, determinamos que el Tribunal de Primera Instancia no incurrió en prejuicio, parcialidad, pasión o error manifiesto. Por ende, nos abstendremos de intervenir con sus determinaciones de hechos y apreciación de la prueba.

Por otro lado, en su segundo señalamiento de error, Annoni niega haber incurrido en conducta temeraria, y solicita se elimine la partida de honorarios de abogado. No le asiste la razón.

Como ya mencionamos, el *foro a quo* dictaminó que Annoni fue temerario al dilatar los procesos, y le impuso el pago de $5,000.00 en concepto de honorarios de abogado. Como se sabe, "[l]a imposición de honorarios de abogado es discrecional". *Blás v. Hosp. Guadalupe, supra*, a la pág. 334 (1998). Así, este foro apelativo no dejará sin efecto dicha determinación, salvo que se demuestre un abuso de discreción. Evaluado el expediente apelativo, no encontramos razón alguna para alterar la conclusión del foro de instancia. **La prueba no demuestra abuso de discreción** y, por consiguiente, estamos impedidos de alterar la determinación apelada, la cual se encuentra dentro del ámbito discrecional que posee el foro primario. Concluimos que el segundo error tampoco fue cometido.

**IV.**

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, confirmamos la "Sentencia" apelada, emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones